## Harding's Estate.

*Wills—Construction—"All personal properties" held to include real estate.*
The words "all personal properties" in a holographic will by an unlearned man, wherein he left "all personal properties, good will & business also personal monies outstanding claims" to his wife absolutely (with the exception of certain pecuniary legacies) will be construed to include real estate in the absence of a residuary clause, so as to avoid an intestacy through which a large part of his property would go to collaterals toward whom he bore feelings of resentment at the time of making the will, by reason of his belief that they had influenced his mother to make an inadequate testamentary provision for him.

Exceptions to master's report. O. C. Phila. Co., Oct. T., 1920, No. 63.

Powell, Ludlow & Schaeffer, for exceptions; Edgar S. McKaig, contra.

GUMMEY, J., May 26, 1922. — The testator, Alexander Harding, died March 19, 1919, leaving his last will, duly probated, the provisions of which are hereinafter set forth. He left to survive him a widow, but no issue.

On Oct. 13, 1920, upon petition of the testator's sister and brothers, alleging that he had died intestate as to his real estate, a citation was awarded to show cause why an inquest in partition should not be granted, to which the testator's widow made answer, denying the right of the petitioners to have partition as prayed for, and thereupon, a replication having been filed, the proceedings were referred to Philip L. Leidy, Esq., as master, who, after due hearing and notice to the parties in interest, submitted his report, in which he recommended that the inquest should be refused because he was of the opinion that the petitioners had no interest in the real estate they desired to have parted.

The exceptions to the report of the master are now before us, and the question for our consideration is whether the testator died intestate as to the real estate of which he died seized, or whether he devised it to his widow in fee, his will being as follows:

"My last Will & Testment  September 5th, 1917.  All personal properties, good will & business also all personal monies outstanding claims, I bequeath to my wife, Mary W. Harding—With the exception of fifteen hundred dollars to each of my step children, Catherine E. Means and Hazel P. Means, also two hundred dollars to Hiram Lodge No. 8, F. and A. M., for the Charity fund With the only request that they (Hiram Lodge No. 8) see that my grave is in order.  Also one hundred & fifty to Germantown Commandery No. 82 for the Charity fund.  Also my brother William S. Harding the sum of seven hundred.

"I make my wife executrix of my estate.          ALEXANDER HARDING."
"Witness  Fred Appleton, George Nathan."

Alexander Harding was by occupation a cabinetmaker, and he and his father, trading as J. S. Harding & Son, had built up a profitable business as dealers in antique furniture at No. 5109 Germantown Avenue.  After the death of his father, Alexander Harding continued to carry on the business at the same address, leasing the premises from his mother, Annie Harding, who held the record title.  On March 18, 1913, he executed a will which had been prepared by an officer of the Chelten Trust Company; it was signed with the usual formalities and lodged with the trust company, in whose custody it remained until after his death.  This will bequeathed his business to his brother William, with certain qualifications, and after a gift of $200 to each of his brothers, John and Henry, and the gift of a like amount to his sister, Mrs. Chambley, the testator devised and bequeathed the residue of his estate

1 D. & C.

to his wife, Mary W. Harding, absolutely, and appointed her and the Chelten Trust Company as executors.

On Sept. 5, 1917, Alexander Harding wrote the holographic will which is the subject of the present discussion and which is set forth above in full. In it he makes no mention of Mrs. Chambley nor of any of his brothers except William, to whom he bequeathed a legacy of $700 instead of the business given him by the former will.

In the interim between the execution of the will of 1913 and the one of 1917, any feeling of affection which the testator might have had for his brothers and sister appears to have been replaced by a feeling of resentment, except, perhaps, as to his brother William. He attributed to them, and particularly to his sister, Mrs. Chambley, an influence over his mother in the making of her will, the provisions of which were not as favorable to him as he thought they should be. This feeling of resentment also extended to the officers of the Chelten Trust Company and reached its climax when that company, as executor of his mother's will, gave him notice to vacate premises No. 5109 Germantown Avenue, as a result of which he subsequently purchased the property. He also had an extreme dislike for members of the legal profession, and this fact, together with his resentment against the officers of the Chelten Trust Company, probably explains why, when he desired to change his will, he wrote a new will himself, and instead of obtaining from the trust company his first will and destroying it, revoked it by writing upon a copy of it which he had in his possession the following words:

"Original of this in Chelten Trust Co. hands this will is now *null & void*. Sept. 5th, 1917.                                ALEXANDER HARDING."

The circumstances immediately surrounding the execution of his last will are as follows: George Nathan, who was one of the witnesses to the will, said, referring to the testator: "He was over in my house one evening when Mr. Fred Appleton was present, and he wanted us to go over to his place of business to witness the will." This they did, the witness further testifying to the effect that the testator wrote the will in his (the witness's) presence and that of Mr. Appleton; that the testator then signed it in their presence; the witnesses also signed their names, and then all three returned to the witness's house, where they had a game of penny-ante.

When a will is executed, the natural and reasonable presumption is that the testator does not intend to die intestate as to any part of his property (Miller's Appeal, 113 Pa. 459), and placing ourselves in the position of this testator at the time he wrote the will (see Shaffer's Estate, 262 Pa. 15), and taking into consideration the circumstances surrounding him at the time of its execution (Kempton's Estate, 26 Dist. R. 441; Hermann's Estate, 220 Pa. 52), we find a state of facts confirming this presumption and not rebutting it.

Analyzing the will itself, the controversy centers upon the intention which the testator had in mind when he used the expression "All personal properties."

In the carefully prepared report of the master in which the cases are reviewed, it is pointed out that the word "all" has been held sufficient to pass real estate (Clingan v. Mitcheltree, 31 Pa. 25), and that the word "property" is a word of broad signification, and, standing alone, would include real estate (see George v. Railroad Co., 47 Pa. Superior Ct. 520); so that if the testator had said "all property," it cannot be doubted but that real estate would have passed by the gift. The testator did not, however, use *property* in the singu-

lar, but in the plural, *properties*, and, quoting from the master's report (page 14) :

"Had the testator been speaking of his personal property collectively, as is commonly done in wills, he, too, would have employed the singular *property*, as would any one who meant to refer to personal property.

"The importance of this is emphasized by analogy to Hildebrant's Estate, 268 Pa. 132 (1920), which turned on this very point, the use of the plural form of expression, Mr. Justice Simpson saying: 'Moreover, while it is, of course, true that a son may be held to be a relative, even though he is called 'son' everywhere else in the will, and though popularly he never would be called a relative, yet certainly a son cannot be 'relatives,' the plural form of expression necessarily excluding him.'

"Whatever restraining force the word *personal* would have on *property*, to confine that word to the species of property which is not real property, it cannot have on *properties*, because the plural form of expression necessarily excludes its being restrained to a single kind of property."

We are thus brought to the same conclusion as the master, that the testator used the word "personal" in the sense of "my;" again quoting from his report (page 12) with reference to the use of the word "personal:"

"While to every law-trained mind it primarily means a species of property, it does not necessarily convey the same meaning to the mind of the layman not familiar with legal terms. It is a familiar word of everyday life. We speak of our personal friends, meaning friends intimately associated with us as individuals; our personal possessions, meaning those things intimately associated with the person; our personal home, meaning our home owned by us or *my* home owned by *me*, etc."

Evidently the testator in his own mind drew a distinction between so much of his estate as was represented by his business and that portion of his estate which was not invested in the business. This is shown by the manner in which he classifies his estate in the will, disposing, as he does first, of "all personal properties," then of the "good will & business," and then "all personal monies" and "outstanding claims." For *"personal* monies" we may well substitute *"my* monies," by which he may have intended to refer to the fact that he had two bank accounts, or, what is most likely, he may have meant by "monies" to include not only his bank accounts, but also the few bonds and other personal property which he owned outside of his business; for "money," in its popular sense, is sometimes used as equivalent to property. See Jacobs's Estate, 140 Pa. 268; Marshall's Estate, 20 Dist. R. 265.

This view is also consistent with the size and character of the testator's estate. From statements made by counsel at the argument, we understand that the equity in the testator's real estate over and above encumbrances is approximately $12,000, while the appraised value of his personal estate amounts to $10,417.85. Classifying the personal estate in the manner indicated by the will, we find that the appraised value of those items which would properly pass under the designation "good will & business" amounts to $6451.21, while "personal monies" might be held to include cash, $2973.50, and sundry miscellaneous items (including $300 Liberty Bonds, one share of stock, $100, and household furniture, $252), aggregating $993.14; and if we were to adopt the construction suggested by the exceptants, this last item, $993.14, would be all that would pass under the designation "all personal properties," which would seem an absurdity, particulary when we remember that the legacies bequeathed by the will aggregate $3850, to pay which would require practically all of the testator's personal estate except his investment

in the business. On the other hand, if we read *personal* as *my*, the expression "all personal properties," when read in connection with the rest of the will, makes the whole harmonious. Said the present Chief Justice in Long's Estate, 270 Pa. 480, 487: "We need only say of the many authorities cited to us by counsel that precedents are of little value in the construction of wills, because, when used under different circumstances and with different context, the same words may express different intentions. When the intent of the testator, and by that is meant his actual intent, can be fairly gathered from his words, the fact that another testator has used the same words with a different meaning is of no avail. Neither precedents nor rules of construction can override the testator's expressed intent."

We agree with the conclusion reached by the master, that the petition for partition should be dismissed for lack of interest in the petitioners, and that under his will the testator's widow, Mary W. Harding, takes a fee in the real estate of which he died seized. We, therefore, enter the following

*Decree.*

And now, May 26, 1922, the exceptions to the report of the master, filed on behalf of John Harding, Mary Jane Chambley, Harry Harding and William S. Harding, are dismissed; the petition for an inquest in partition is likewise dismissed, and the costs of the proceedings, including the master's fee, are charged against the real estate, for the reason that it was necessary to have a judicial construction of the will in order to determine the question of title.